STATE of Missouri,
Plaintiff-Respondent,

v.

Anthony ROGERS, Defendant-Appellant.

No. 40039.

Missouri Court of Appeals,
Eastern District,
Division One.

June 19, 1979.

Paul E. Ground, Manchester, for defendant-appellant.

George A. Peach, Circuit Atty., Gordon L. Ankney, Asst. Circuit Atty., St. Louis, John D. Ashcroft, Atty. Gen., Paul Robert Otto, Marjorie Wholey Haines, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Judge.

Defendant was found guilty by a jury of murder in the second degree. The court sentenced him to twenty years in the Department of Corrections. Defendant duly appealed and alleged four errors of the trial court.

From the State's evidence we learn that the shooting which resulted in the death of Ray B. Gladish occurred about 2:34 p.m., November 7, 1976, at Calvary Cemetery, located in the northeast section of the City of St. Louis. At the shooting the defendant also received a gunshot wound and the slug remained in his shoulder. Other pertinent facts will be discussed as the court reviews the appellant's contentions.

Appellant first contends that he was denied the right to trial by an impartial jury as guaranteed by the 6th and 14th Amendments to the United States Constitution. We cannot agree.

On October 27, 1977, an article appeared in the St. Louis Globe-Democrat reporting the acquittal of Tommie Overstreet of murder and robbery. Overstreet had been previously convicted of first degree murder and first degree robbery and sentenced to concurrent terms of life and five years. He appealed to the Missouri Court of Appeals, Eastern District, which affirmed his conviction. However, the Supreme Court of Missouri reversed, holding that the admission in evidence of the bullet removed from Overstreet's buttocks was reversible error.[1] Overstreet was granted a new trial and acquitted.

Appellant's situation was remarkably similar to that of Overstreet. Appellant, like Overstreet, was charged with first degree murder and first degree robbery. Like Overstreet, he had sustained a bullet wound in which the bullet did not exit his body. However, unlike Overstreet, the bullet was not introduced into evidence against him because appellant refused the state permission to remove the bullet. Appellant's motion for refusing surgery was sustained based upon the Overstreet case.

On October 27, 1977, the day appellant's case was to go to the jury, the St. Louis Globe-Democrat reported the acquittal of Overstreet. The article contained statements made by the St. Louis Circuit Attorney George Peach who was aware of the instant case being tried and that it would be submitted to the jury. The article read:

> Tommie W. Overstreet, whose murder-robbery conviction was reversed by the Missouri Supreme Court on the grounds that surgical removal of a bullet for use as evidence against him was unconstitutional, won acquittal Wednesday in a new trial on the same charges.
>
> "The score card should read Supreme Court 1, the people of St. Louis 0," St. Louis Circuit Attorney George Peach said bitterly after Overstreet was found innocent by a jury that deliberated 2½ hours.

1. See *State v. Overstreet*, 551 S.W.2d 621 (Mo. banc 1977).

"Overstreet walked free today, and I wish someone else had to explain the result to the dead man's family. It's frustrating," Peach said. St. Louis Globe-Democrat, Oct. 27, 1977 at 1A and 6A.

The article gave a history of the Overstreet case and quoted the comments of the Circuit Attorney:

"We are forced to try this case with one hand tied behind our backs, and the fact finder (the jury) was deprived of hearing all the relevant evidence by a Supreme Court ruling which was based on a 1976 federal case, decided two years after we were presented with the problem." Peach noted that "we obtained our order in 1974 for removal of the bullet under existing legal principles at the time" and Overstreet "was not harmed by the operation. The evidence was there, and we were forced to close our eyes to it."

It came to the attention of the court that some of the jurors in appellant's case might have read the article and thereby been prejudiced. Appellant moved for a mistrial.

■ We recognize that freedom of discussion should be given the widest range compatible with the essential requirements of the fair and orderly administration of justice. But that must not be allowed to divert a trial from the very purpose of the court system which is to adjudicate controversies in the tranquility and the solemnity of the courtroom according to legal procedure. The jury's verdict must be based on evidence properly received in court and not from outside sources. Due process requires no less. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial court must take strong measures to insure that the balance is never weighed against the accused. Appellate tribunals have a duty to make an independent evaluation of the circumstances to insure that publicity has not had a prejudicial effect on jurors. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 6 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct.

1639, 6 L.Ed.2d 751 (1961). Receipt by a juror of possibly prejudicial information during a trial of a felony case requires that the verdict be set aside unless the state affirmatively shows that the jurors were not subject to improper influence. *State v. Raspberry,* 452 S.W.2d 169[15] (Mo.1970); *State v. Jones,* 363 Mo. 998, 255 S.W.2d 801[8] (1953). The function of an appellate court on a denial of mistrial is to determine, as a matter of law, whether the trial court abused its discretion in refusing to declare a mistrial. The declaration of a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where prejudicial effect can be removed in no other way. *State v. Raspberry,* supra [8].

■ Our review of the circumstances indicates that appellant was not prejudiced. The state more than affirmatively met its burden. The experienced trial court adroitly questioned the jurors individually and collectively in such a way so as to not highlight any prejudicial effect the article may have had on the jurors. Both attorneys were free to ask questions and defense counsel took advantage of the opportunity. The interrogation of the jurors occupies twenty-six pages in the transcript. As was said in *State v. Cooper,* 541 S.W.2d 40 (Mo. App.1976):

Familiarity with facts, or purported facts, from news reports without the formation of an opinion does not necessarily require disqualification of a juror. *State v. Spica,* 389 S.W.2d 35 (Mo.1965), cert. denied, 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966). Defendant's right to a fair and impartial jury does not extend to having a jury panel which is completely devoid of any news reports, and as the United States Supreme Court recently ruled in *Nebraska Press Association v. Steward,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), ". . . [T]hese cases demonstrate that pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." Id. at 553, 96 S.Ct. at 2800.

Although the frustration publicly conveyed by the Circuit Attorney to the news

media was malapropos, imprudent and disrespectful, this court is unable to find any prejudice to appellant. We rule that the trial court did not abuse its discretion.

Appellant's second contention is that he was denied the right to an impartial jury in violation of the 6th and 14th Amendments to the United States Constitution due to improper questions asked by the prosecutor. We cannot agree.

As mentioned, appellant had been wounded but refused to have the bullet removed. Mr. Ankney, the assistant prosecutor, asked,

"Doctor, the wound or the bullet that is located close to the skin in the shoulder area in the back, would that be difficult to remove?"

The doctor responded, "I don't feel it would, no."

The defense attorney objected and moved for a mistrial. The court sustained the objection, admonished the jury to disregard the answer and denied the motion for a new trial.

■ The granting of a mistrial rests in the sound discretion of the trial court who is in a better position than the appellate court to evaluate the prejudicial effect of the occurrence initiating the request for a mistrial. *State v. Morgan*, 546 S.W.2d 207 (Mo.App.1977). The reviewing court, in order to hold that a failure to grant mistrial was a reversible error, must conclude as a matter of law from the entire record, that the error was so prejudicial that its effect was not removed by the action of the trial court. *State v. Harris*, 535 S.W.2d 145 (Mo. App.1976).

■ Our review of the entire record does not warrant a reversal of the trial court. Any prejudice suffered by the appellant was cured when the trial court instructed the jury to disregard the answer.

Appellant's third contention is that the seizure of keys from the hospital dressing attendant by a police officer without a warrant or appellant's consent, at a time when probable cause did not exist to suspect that he had committed any crime, violated his right to be free of unreasonable seizures as guaranteed by the 4th and 14th Amendments to the United States Constitution. Due to the unusual facts of this case we cannot agree.

■ *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), held that the "security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the 14th Amendment. *Id.* at 27–28, 69 S.Ct. at 1361. However it wasn't until *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), that the exclusionary rule, which had previously rendered inadmissible illegally seized evidence by federal officers in a federal prosecution, was held binding upon the states. Thus after *Mapp v. Ohio*, supra, illegally seized evidence by state officers was inadmissible in a state prosecution.

We turn to the question of whether the seizure of keys by the police was unreasonable and illegal. Officer Johnson of the St. Louis Metropolitan Police Department found the appellant Anthony Rogers critically injured with multiple bullet wounds in Calvary Cemetery in North St. Louis. Rogers explained that four, black males, in a 1974 Cadillac, had shot him. Johnson accompanied Rogers to City Hospital Number Two where Rogers was taken to the main floor emergency room. There a dressing attendant, a hospital employee, cut away Rogers' clothing and inventoried his belongings while Officer Johnson was present. After the inventory was completed, Officer Johnson obtained Rogers' clothing and belongings by signing a hospital receipt. Rogers' possessions were taken in anticipation of the prosecution of his alleged assailants. Among the items received was a key ring with eight keys. Unknown to the police officer at the time, Rogers had taken the keys from Rayburn B. Gladish whom Rogers had robbed and shot. At no time prior to or contemporaneous with the seizure did Officer Johnson suspect Rogers to be guilty of a crime. The keys were

subsequently identified by Mrs. Gladish as belonging to her husband. Gladish subsequently died from the gunshot wounds.

Appellant argues: (1) Warrantless searches, subject to a few well-delineated exceptions, are per se constitutionally offensive, citing *State v. Peterson*, 525 S.W.2d 599 (Mo.App.1975). (2) Two recent Eighth Circuit cases, *United States v. Heisman*, 503 F.2d 1284 (8th Cir. 1974), and *United States v. Goldenstein*, 456 F.2d 1006, *cert. denied sub nom. Ray v. United States*, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1972), divide the "well-delineated exceptions" into three categories: (a) searches made with the consent of the person being searched, (b) searches made incident to lawful arrest, and (c) searches made in emergency circumstances. (3) None of the "well-delineated exceptions" are applicable to this case. (4) Ergo, the seizure was illegal.

We disagree with appellant's contention that there are only three "well-delineated exceptions" to the warrant requirement. As was said in *Kansas City v. Butters*, 507 S.W.2d 49, 53 (Mo.App.1974):

A properly issued search warrant does not stand alone as the only means by which the Fourth Amendment requirement of reasonableness can be met. The Fourth Amendment's absolute admonition against unreasonable searches is not violated, (1) by search incident to lawful arrest, *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) and *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), (2) by protective searches by officers for weapons upon less than probable cause to arrest, *Terry v. State of Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), (3) by seizure of items falling within the "plain view" doctrine, *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), nor (4) by the search of a motor vehicle where "probable cause" exists to believe that it contains a substance which offends against the law, *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 453 (1925) and *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

As was said in *State v. Quinn*, 565 S.W.2d 665, 671 (Mo.App.1978), other exceptions may be added to this list:

consent, *State v. Rush*, 497 S.W.2d 213, 215–216 (Mo.App.1973); exigent circumstances, *Wiley*, 522 S.W.2d at 293–295; inventory searches, *Opperman*, 96 S.Ct. at 3098; *State v. Archter*, 512 S.W.2d 894, 904 (Mo.App.1974); officer sees a person "drop evidence" and the officer seizes it, *State v. Hall*, 534 S.W.2d 508, 510 (Mo.App.1976); *State v. Boykins*, 434 S.W.2d 484, 486 (Mo.1968); *State v. Baines*, 394 S.W.2d 312, 315–316 (Mo.1965), cert. den. 384 U.S. 992, 86 S.Ct. 1900, 16 L.Ed.2d 1008; *State v. Jefferson*, 391 S.W.2d 885, 888 (Mo.1965); property is abandoned, *State v. Brewer*, 540 S.W.2d 229, 231 (Mo.App.1976); *State v. Tarantola*, 461 S.W.2d 848, 851 (Mo.1971); *State v. Stavricos*, 506 S.W.2d 51, 58 (Mo.App.1974), and *State v. Jackson*, 476 S.W.2d 540, 542 (Mo.1972).

This list is not exhaustive but in any event there are considerably more than three "well-delineated exceptions" to the warrant requirement.

While it is often articulated in the cases that warrantless searches are per se constitutionally offensive subject to few exceptions, the fundamental inquiry of the courts in considering 4th Amendment issues is whether or not a search or seizure is reasonable under *all* the circumstances. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Mulligan v. United States*, 358 F.2d 604, 607 (8th Cir. 1966).

We cannot conclude that the seizure was unreasonable. Officer Johnson found appellant Rogers critically wounded and in need of immediate medical attention. Appellant told the police officer that four black males in a 1974 Cadillac had shot him for no apparent reason. This type of occurrence, unfortunately, is not unusual in the metropolitan St. Louis area. Officer Johnson believed Rogers and accompanied him to the hospital. There the officer watched

the dressing attendant cut away Rogers' clothes and inventory his personal possessions. The officer, still under the mistaken belief that Rogers was the victim of an assault, took custody of the personal possessions which had been inventoried by the hospital attendant. Officer Johnson seized appellant Rogers' belongings, including the keys, in order to preserve them as evidence for the prosecution of his fictitious assailants. These possessions were direct, physical evidence that would be relevant to such a prosecution. Under the above circumstances the seizure of the keys was not unreasonable.

The final contention made by the appellant is that the trial court erred in admitting a hearsay statement as a spontaneous utterance.

■ The evidence revealed that the victim, Buford Gladish, was a sixty-six year old man who was in the custom of visiting the cemetery. On Sunday, November 7, 1976, he visited Calvary Cemetery. Mrs. Helen Caito also visited the cemetery that day. As Mrs. Caito drove through the cemetery she passed Gladish's parked car. She noticed that Gladish sat in the driver's seat and that he was accompanied by a young black male who sat in the front passengers' seat. While visiting at a grave site Mrs. Caito heard what she described as "hammering noises." Upon leaving the cemetery, some five minutes later, the woman again passed Gladish's automobile. Mrs. Caito observed that Gladish's head was slumped backwards against the driver's seat and that he appeared very pale. The car's left side window was broken and there was glass and blood on the pavement. The young man that previously accompanied Gladish was not present. The witness then alighted from her car and approached Gladish. His eyes were closed and she made no attempt to communicate. Mrs. Caito went immediately to a nearby police station and returned to the scene with an officer some ten minutes later.

The victim was placed in an ambulance and taken to City Hospital Number Two. Officer Larry McDaniel, who rode with Gladish to the hospital, watched the victim continuously. The officer observed that Gladish showed no sign of regaining consciousness; nor did the victim respond when the ambulance attendants inserted tubes into his nose and needles into his arms.

Upon arriving at the emergency room the victim was still unconscious. Five minutes later a doctor asked Mr. Gladish, "What happened?" Officer McDaniel who had remained alongside the victim heard Gladish respond that a young black male got in his car and shot him, and that Gladish had shot his assailant back. This statement was made fourteen minutes after the victim was placed in the ambulance. The total estimated time from the shooting to the statement was thirty to forty minutes. Due to the gunshot wound Buford Gladish died of hemorrhagic shock: loss of blood.

The appellant argues that the victim's response to the doctor's inquiry is not admissible as a spontaneous statement. We do not agree.

■ Viewing the evidence in the light most favorable to the state, the victim's response indicated spontaneity. It is generally held that spontaneous exclamations and statements uttered contemporaneously with or shortly after an unusual occurrence, usually the crime involved, by a person who is still under the influence of its effects are admissible into evidence. The rationale of this exception to the hearsay rule is that where the statement is made under the immediate and uncontrolled domination of the senses as a result of the shock produced by the event, the utterance may be taken as expressing the true belief of the declarant. Under this exception the statement need not be strictly contemporaneous with the act described. The test of the admissibility of a spontaneous statement is not when the statement was made, but whether under all the circumstances, the speaker may be considered as speaking under the stress of the nervous excitement produced by the event, or whether that excitement had died away. 22A C.J.S. Criminal Law § 662(3) (1961) at 671. The essential test of whether a hearsay state-

ment is admissible as a spontaneous statement is neither the time nor place of its utterance but whether the utterance was made under circumstances which indicate that it is trustworthy. The burden is on one offering the declaration to prove the facts which warrant its admission. *State v. Hook*, 432 S.W.2d 349, 353 (Mo.App.1968).

The State has carried its burden. There is no doubt that the statement was made while the victim was under the influence of the event. He made no statements prior to the one at issue. He remained unconscious while in the presence of the officer. He gave no indication of being conscious while being transported to the hospital in the ambulance despite the insertion of the tubes and needles into his body. He remained unconscious at the hospital and as he gradually regained consciousness he responded to the doctor's inquiry.

This court concludes that the statement was spontaneous, trustworthy and was produced by the incident and we will not disturb the trial court's ruling.

Judgment of the trial court is affirmed.

SNYDER, P. J., and SMITH, J., concur.